First Case, which is 21-1088 Lingenfelter v. Kaiser Foundation, Mr. Leichty and Mr. Wilecki. Mr. Leichty, you may proceed. You are on mute, sir. Sorry. I asked for oral argument today to answer questions regarding the facts, but first I want to make two points. One of you may ask why the prima facie evidence cannot be used in analyzing pretext. Now, the evidence could be used if it were relevant, as in the Metzler case, but it is not relevant because all of the pretext issues occurred in the 11 days after November 30. Nonetheless, Judge Domenico spent three of his eight-page ruling discussing how the prima facie facts, the ones based on hearsay, weakened plaintiff's pretext argument. Of course, this weakening was not possible because the facts before November 30 had little to do with the facts after November 30, except to show Ms. Cameron's poor history with plaintiffs. Second, I want to make sure you understand our argument regarding pretext. We are following the lead of the union representative, Ms. Mayberry, who entered this case a few days after December 6, when the supervisor, Ms. Cameron, elevated the inappropriate relationship statement to a termination issue. In the termination meeting on December 11, Ms. Mayberry made this very clear from the start, and that's found at the appendix, either pages 273 through 275, and the memo is also found on page 217 through 219. Ms. Mayberry was perfectly clear in telling Ms. Cameron that Ms. Cameron was abusing the system by making plaintiff write a letter she did not have to write. That's in that memo that was written by Ms. Cameron. She was clear in saying that Ms. Cameron had a poor history with plaintiffs, and that Ms. Cameron was managing her out. So, our theory is that Ms. Cameron knew she was abusing her power on December 6, when she elevated the importance of the statement, and knew she was setting up the union representative to have plaintiffs fail. As Ms. Mayberry said, Ms. Cameron was manipulating the rules to manage plaintiff out. That was the pretext to cover up the FMLA-ADA retaliation. I would like to reserve the rest of my argument for rebuttal, unless there's questions now. No, I don't think... Go ahead. Go ahead. No, no, I'd rather hear from you. Council, I'm not sure I was following your opening point about pretext evidence, or evidence of the prima facie case relating to pretext at the risk of repetition. Could you just explain that one more time? Sure. The pretext argument had to do with the various tiffs that plaintiff and Ms. Cameron had in that summer and fall, when Ms. Cameron was trying to discipline plaintiff for her absences and arriving late, but the union steward pointed out, you can't do that, because she's arriving late to take care of her sons. They have autism, and so they had to take... Actually, she didn't use but maybe half of her hours of her FMLA leave per year. So, she wasn't abusing it at all. Then there was a time where Ms. Cameron was questioning whether a plaintiff could even take leave, and the union steward actually reported Ms. Cameron to HR. Now, all of that occurred before November 3rd, and the judge, Judge Domenico, said that there's enough evidence here to support a prima facie case. I think that we can go on to the pretext issue. The pretext issue in this case, as opposed to in the Metzler case, was entirely separate, because the pretext issue was based solely upon the discussion that plaintiff had with the two receptionists, in which she said that she thought that one of her colleagues and a doctor had an inappropriate relationship, because the colleague was to the doctor. That's what was elevated to the termination level. It really had nothing to do with the absences and the times that Ms. Cameron was trying to discipline plaintiff prior to November 3rd. So, you're saying everything that happened up till then is irrelevant to pretext? Yes. Well, except to show that there was an ongoing poor relationship between plaintiff and Ms. Cameron. That's the only relevance, but that really has nothing to do with our pretext argument, except just that the accommodation. One of the problems with the argument is, contrary to our precedent, we've decided at least 15 years ago in the Wells case that you can use any evidence with respect to pretext that's been presented at the summary judgment. I think you have a pretty good case here, but I can see why you lost in district court, because I've gotten totally confused by your opening remarks. The defense says that she was fired because she didn't have a proper letter stating that she would change her behavior when they met with the employer's representative. I don't remember the exact date, and your burden is to show that that wasn't the real reason that she was terminated. Right. I've got some arguments, but I didn't hear any of them. Tell me why you just said we can't consider this evidence. Why do you think that was a prediction? Why that was pretextual? What about it didn't ring true? Okay. You just go through it and try to be organized about it. You can consider any evidence that was presented to court at summary judgment. Okay. It all hinges on what happened on December 6th. Remember, she made the comment on November 30th. Nothing happened for a week. What comment are you referring to? What comment on December 6th? Help us. Don't try to confuse issues. Try to help us understand. She said to the two receptionists that Wesley and the doctor have an inappropriate relationship. That then was conveyed to Ms. Cameron, I believe that day or the next day. Wesley actually made a complaint to Ms. Cameron at 11 o'clock. It might be an email complaint. Ms. Cameron did nothing about that, but then six days, seven days later on December 6th, she called a meeting to confront plaintiff with a statement. And Ms. Mayberry, the subsequent union representative said that meeting should have never been raised to what's called a level four. Level four is the last step before termination. And in that meeting on December 6th, Ms. Cameron said, you have to write this letter. And if you write this letter, then we go to termination. That's what level four means. When Ms. Mayberry came into that meeting, you can see from the meeting memo, that three page memo, Ms. Mayberry was livid and she was yelling. I mean, that's what Ms. Cameron wrote, that she was yelling because Ms. Mayberry said, you are just railroading her through. This is not fair. This is not what our contract says you're supposed to do. So, except the contract doesn't require you to go step by step. The contract specifically approves or authorizes going to step four. Yes. If going to step four was not a violation of the contract. Not per se. What do you mean by not per se? What does that mean? It either violated it or didn't. No, there has to be a reason to go to that level. And if you don't have a justification to go to that level, then it's violated. Where is that in the contract? What does it say? Well, the contract is based upon a series of steps. It's based upon that. So, you have to level one, then a level two, then a level three, then a level four. You just agreed that the contract doesn't require you to go through that step by step. If there's something such as the drug use case. If an employee is using drugs at the hospital, yeah, that's serious. And that gets elevated immediately to the step just before termination. But if it's a statement, you know, these guys have an inappropriate relationship because they're spreading rumors. That does not merit going to a step before termination. Well, counsel, but didn't Mr. Espinoza also report that Ms. Lingenfelter had left the patient unattended? That also preceded the December 6th meeting. It wasn't just the comment to the receptionist. And leaving a patient unattended, that allegation seems pretty serious, doesn't it? And why couldn't they exercise discretion to go to a level four based on both of these issues? Well, if that's the case, then her termination should have been based on that. Now, we argue. Well, no, wait a minute. Wait a minute. Your complaint has been simply that they went to level four on December 6th. We aren't even to the termination. That happened on December 11th. So what's wrong with level four on December 6th? Because normally, if it's leaving a patient unattended, well, then let's talk about it. And that's what they were doing. That's what they were talking about, right? Apparently, they mentioned it. And we say that they mentioned it. And they said that's the reason for the termination. But in the termination document, they said in their arguments now before the court, they say, no, that was not the reason for termination. So if you say something is a reason for termination, and then later, you do not maintain that that was the reason for termination as pretext. In other words, if you're going to say something, stand behind it. If you're not going to stand behind your statement, then that's evidence of pretext. A jury could say, oh, that's not right. They got rid of her because they just didn't want to deal with all of her absences. They were kids. That's all we're asking is that that question go to the jury. Well, what explain then why the her conduct at the at the meeting and the failure to complete the commitment letter? Why wouldn't that failure be a independent non pretextual reason for her termination? Well, actually, she had the termination. She had that letter that may have called the letter there was on her phone. She also had to print it out. That was shown at the end of the meeting. It was the the Miss Mayberry, the union representative said, this is ridiculous. You cannot elevate this so quickly. This is just you're just making this up to get rid of her. That's what she said. She made that perfectly clear in that in that memo. And so that's the pretext in this case. That's that's the basis for our pretext. Now, we put in other bases for pretext in our opening brief and reply. But wait a minute, you still haven't explained why it was non pretextual to basically terminate her because she willfully. You know, disobeyed or or walked back her commitment to the letter. Yeah, they say in that memo that the process was she had to turn in the letter at the beginning of the of the meeting. And we say that the process was you should have never made her do the letter in the first place. That's what that's what Miss Mayberry perfectly clear. You're just really you're setting her up. Well, so I think I think the lower court order said that if she'd complied with the agreement to submit a substantive letter, we wouldn't be here. Right. What's wrong with is that wrong? No, but it's not. It does not focus on the issue. The issue is not what could have done to preserve her job. The issue is, did they get rid of her for a pretextual reason? That's the issue. No, I agree with the court if she had turned that in. But Miss Mayberry said, listen, you guys aren't following the procedures. You're violating our collective bargaining agreement. You're elevating this to a to a termination level when it should never be elevated to a termination. I mean, that's that's fundamentally what our cases are. And we believe a jury should be able to determine whether Miss Mayberry was right or wrong. If no other questions, I'd like to reserve my 30 seconds. All right, let's hear from Kaiser, Mr. Waletsky. Good morning, and may it please the court. My name is Mark Waletsky, and I represent defendant Kaiser Foundation Health Plan of Colorado. Picking up on a point, Judge Timkovich, that you just made. We're here today because Miss Lingenfelter did not do what she had previously agreed to do. Provide a commitment letter. That's it. Kaiser's decision to terminate. Is your position that the reason she was terminated is she did not provide the commitment letter? Is that the ground for termination? It is, Your Honor. And what was wrong? Before the meeting ended, she was ready to present a letter she had written, a commitment letter she had written. It was on her phone. It had been prepared before the meeting. Why was that not She had been given a number of opportunities to present that letter. She had already agreed to present that letter before the meeting. She came into the meeting, followed the advice of her union representative, which frankly was just not good advice, but that's neither here nor there. Why do you say that's not here neither here nor there? That's very important. You're firing her because she's being, because she's following instructions of someone who's supposed to represent her and give her terrible advice. But what you care about is whether she is willing to commit to this. It was clear from the time stamp on her phone that she had prepared this and she lets her lawyer essentially screw it up. Why is it so terrible that two hours later, it was maybe less than two hours, she presents that letter and the person says, no, you're too late. You're too late. You had to present it at the outset, which doesn't make sense either, because then the meeting should have started. Where's your letter? You don't have it. You're on for two hours and then she's fired, even though she was willing to prepare that, to present that letter at the outset of the meeting. Why couldn't a jury hear that evidence and say, they're just looking for a reason to fire her. They're not fairly examining whether she's willing to change her ways. Sure. A couple of reasons. Yeah. A couple of reasons, Your Honor. First, it's undisputed that there was no discussion of termination before that meeting. So Ms. Cameron and Ms. Larkins, the two decision makers, did not go into that meeting with a plan to terminate. So I think it was- Wait, why do you say that? Why do you say that? The rule is, if you don't have a meeting, a level four meeting, this is my understanding of Kaiser's requirements. If you go into a level four meeting, you're fired if you don't provide the commitment letter. Is that not the rule that Kaiser has? That's correct, Your Honor. But Ms. Lingenfelter had agreed to provide a commitment letter. So going into that second meeting was just for the purposes of her providing that commitment letter. And there's deposition testimony that's undisputed that there was no discussion of termination before that meeting. Okay. But she did provide. So at that meeting, she's ready to provide the letter. She did it. Before the meeting ended, she had a letter on her phone that was an acceptable letter, and she's fired anyway. If the purpose of the meeting is to get the letter from her, and she comes to the meeting with the letter, she holds off on it because her representative from the union wants to make some points, which may have some validity, but they weren't serving her interests. Why fire her now? If the purpose is to get the letter, and you accomplished that purpose at the meeting, why fire her? Well, the district court pointed out, and I think this is a critical point, that the only time at which Ms. Lingenfelter and her union representative noted that they had this more detailed letter, which they said was on their phone or waived a piece of paper, was after she had been notified the termination decision had been made. And I think Judge Domenico was correct in asserting that there is no obligation for Kaiser at that point to reconsider its position, or more importantly, there's just no evidence that its refusal to reconsider its position at that point of termination was somehow pretextual, given the fact- But why would you not reconsider if what your real purpose was is to get the letter? Why couldn't a and let Ms. Lingenfelter supply the letter that she had prepared at the outset? Why aren't they satisfied at that point? Couldn't the jury decide that that doesn't make a lot of sense? They moved it up to level four when it seems pretty trivial, certainly not drug use. In the whole context, I totally disagree with opposing counsel that you can't consider all this other evidence. I think it helps them rather than hurt them. But why would the jury say, look, you've escalated this to level four over an ambiguous comment that some people took as a reflection on their sexual orientation, but she didn't say that. And so they escalated to level four so they can fire if she doesn't give a letter. And then when she doesn't give it, even though she prepared it, even though she doesn't present it for a couple hours, they get the letter and they decide to fire. A couple responses, Your Honor. I certainly hear where you're coming from. And I think what that gets into the issue that you're raising of, was this really appropriate or reasonable? That, to me, goes straight to the heart of the business judgment rule, which is the employer's decision doesn't have to be wise, fair, or even correct. And ultimately, I think what you're saying, and I certainly understand what you're saying, Your Honor, as to this position, is this looked like too severe a reaction. They should have given her another chance. But the problem is, in terms of pretext, we have to have some evidence that shows that their explanation is unworthy of belief or that it was cover up or something else. And we just don't have that here. What we have is an argument over whether or not the comments that were made were sufficiently severe to justify skipping steps, but not that that violated the business judgment. And again, I think it could be that someone might say, yeah, that was a little too harsh. But again, that goes right back to the business judgment rule, because we just don't have the inconsistencies, the contradictions, the violation of company policy that would suggest anything other than Kaiser exercised its business discretion in a way that others may not agree. You know, they gave her two hours, they gave her a chance to correct her letter. She chose not to do it. She chose to follow her union representatives' advice. They didn't come in and say, hey, you don't have a letter. We're terminating you right now. That's it. You provided us. We're not even going to give you a chance. They gave her opportunities. To me, that cuts against the argument that this is pretextual, because they sat there in what Ms. Lingenfelter's counsel describes as a pretty heated meeting. And I think that's fair based on the notes that we have. And they tried and they tried and they tried to get the letter. And ultimately, she wouldn't do it because she was following her union representatives' advice until after the termination decision had been made. And it just seems to me that while Kaiser should have reconsidered and allowed her to present it even after they gave her multiple opportunities, and she did submit a corrected letter that still wasn't sufficient, that that somehow is evidence of pretext. Because it's, it just again, to me, goes to right to the employer's perception of the events, which is what, which is what should business judgment. It was that they didn't want to reconsider. So that's, that's our position. The, the other thing to keep in mind, I want to hear your other point, but let me stop you on that point. At some point is you're, you're mentioning the business judgment rule. That's, that's very important in these cases to recognize business judgment. But at some point, it's so unreasonable that that couldn't be the reason. And, and that's, that's where I think we might be in this case. A jury could find, no, they couldn't possibly have felt that they needed to her representative. The heated discussion was because of a representative. So she's essentially being fired because she listened to the person from the union who's supposed to help her, which just doesn't seem reasonable. At some point, doesn't the business judgment seem so absurd, so unreasonable that one can infer that a jury could infer pretext. At some point, I don't think we reached that in this case, because in this case, we're talking about a disagreement over, was this too harsh? Ultimately, I really think that's the point that you're getting at is, wasn't this just too harsh and couldn't a jury conclude that she should have been given, you know, they should have reconsidered their decision because this is just too harsh of an outcome for this employee. And to me, that is still, you're still well within the business judgment rule because it doesn't have to be wise or fair. This could be the most unfair decision in the world, but we just don't have the additional evidence. If they had come in and miss Lingenfelter had presented her December 7th letter, which is a more full and complete letter. And they had said, yeah, this just isn't enough. You're going to have to rewrite it and rewrite it and rewrite it. And no, this still isn't enough. And I think your honor, we'd be exactly where you are, where a jury could say, yeah, she came in with a page and a half letter that took responsibility for what she did and address the issues that she said she was going to address, but Kaiser just wouldn't accept it. I think then you're outside potentially the business judgment rule. That didn't happen here. And it's undisputed. It didn't happen. Even miss Lingenfelter agrees that the initial letter she provided did not satisfy what she had agreed to do. And I agree tough situation. She, you know, she got bad advice, but the fact that she chose to follow bad advice from her union representative does not convert Kaiser's explanation into one that's unworthy of belief or make it pretextual. And that's really our point, especially going in, looking at all the surrounding circumstances that they had no plan to terminate before this meeting. They just didn't. Could I just interject? Could you clarify one thing about the sequence of events and what Ms. Cameron knew? So at the beginning of the meeting, Ms. Lingenfelter presents the one sentence letter. And then the meeting proceeds. It's a lengthy meeting, heated meeting. She's given opportunity to give a more adequate letter. She writes one more sentence. Am I so far so good? Mostly. I don't believe that letter, that first letter with the one sentence was given right at the beginning of the meeting, but neither here nor there. Otherwise, I think you're because there were caucuses and arguments, and then she wrote that and then more arguments. And then she added that one sentence. Okay. So we have the one sentence letter, the two sentence letter. They, towards the end of the meeting, they, they tell her she's being terminated. And after that, she says, oh, now I'm going to give you the longer letter on her cell phone. Is that correct? Yeah. She either said we have it on our cell phone or Ms. Mayberry claims in her declaration that they waved a piece of paper at her. But either way, it was after the termination when they said we have a more complete letter. Okay. So my question is, did Ms. Cameron or Ms. Larkin know before they said she was terminated, that the more extensive letter on the phone existed? Did they have any knowledge of that? No, there's no evidence whatsoever that they had any knowledge of that. Ms. Lingen felt her in her deposition testified unequivocally that she hadn't presented that letter at the meeting. And there's nothing in the notes or anything else to indicate that they had any knowledge that there was a more developed letter that had been written beforehand. Mr. Woletzka, I know your time's up, but I just had a quick question. Did the two supervisors that made the termination decision, who were they again? Cindy Cameron and Janet Larkin. Cindy Cameron was the actual supervisor and Janet Larkin was a stand-in for another supervisor. No, there's some evidence in the about Ms. Lingenfelter's absences for medical leave purposes. Does the record reflect that Larkin and Cameron were aware of those comments or concerns or dissatisfactions by the other other workers in the, in the Kaiser facility? There's no evidence that Ms. Larkin's had that the others there is some dispute and, and judge Domenico concluded that to the extent there was a dispute on a statement that Mr. Espinoza made about Ms. Lingenfelter's testimony. So there was a statement that Mr. Espinoza said, we need to rip off the band-aid. Debbie, you're Debbie Lingenfelter. You're the problem in this department and everyone knows it. Whether Ms. Cameron was there or not is, is a matter of dispute. Again, our view is, is that according to Ms. Lingenfelter's testimony, she was not. There are also your honor, and I apologize for the length. I'm trying to make this quick, but there are some references in some of the emails that were passed along to Ms. Cameron that for example, Ms. Lingenfelter left in a hurry to, for her FMLA leave and didn't check this. We didn't view that as a complaint about FMLA leave. It was providing context to the extent that there were other complaints or concerns. It's number one, our view is that those were hearsay, but number two, it's I don't believe that Ms. Cameron necessarily had information about those statements, nor is there any evidence in this, I'm sure of that she adopted or agreed with any other coworkers complaint or concern about Ms. Lingenfelter using FMLA. All right. Thank you. Appreciate it. Your time's expired. You had some rebuttal time. You may proceed. Thank you. Judge Hartz. I just want to point out one thing because I think this, this concerns you that Ms. Mayberry, although she was giving probably bad advice to Ms. Lingenfelter, because if she had thought about the easiest way to get through this hearing, just show the letter and we'll get through the hearing. However, Ms. Mayberry was really upset because she felt that Ms. Lingenfelter was being railroaded because it should have never gone to a level four. That's something that it's somewhat hard for us to appreciate because we're outside of the system, but she was in that disciplinary system and she said, you are just perverting this system by raising this to a level four, basically raising it to the level where if you don't do this, you're terminated. And so that's why she was so concerned. It's a little bit difficult for us to understand that because we're not in the system, but, but she was, and she had been in the system for four years. And she said, this is just a railroad job I've You are excused and the case is submitted.